150 A.2d 621 (1959)
Dana E. CARMER, Plaintiff,
v.
J. LEO JOHNSON, INC., a corporation of the State of Vermont, J. Leo Johnson and James E. Knapp, Defendants.
Court of Chancery of Delaware, New Castle.
April 2, 1959.
*622 Herbert L. Cobin, Wilmington, for plaintiff.
James F. Kelleher, Wilmington, for defendants.
SEITZ, Chancellor.
Plaintiff seeks an accounting from defendants on the basis of an alleged joint business venture.
Prior to January 1956, the Pennsylvania Railroad Company ("Railroad") had discontinued the use of the north bound track on its Cape Charles Line. The tracks were plotted in different sections. For our purposes the first section covered from Armstrong's Corner to north of Cheswold; while the second section went from north of Cheswold to north of Seaford.
Plaintiff, Dana E. Carmer ("Plaintiff") along with one, Norman C. Hicks ("Hicks"), and Leslie Fenwick ("Fenwick") decided to try to purchase the ballast and ties for a distance which included both sections. After discussing the matter with certain of the individuals mentioned, the Railroad insisted upon entering into a contract with a corporation. In consequence, J. Leo Johnson, Inc. (corporate defendant), was approached by Fenwick and, for a consideration, it agreed to and did enter into the agreement with the Railroad. Under the terms of this agreement dated January 20, 1956, the corporate defendant purchased the ties and ballast from the first section. The Railroad was to be paid $5,000. By an agreement also dated January 20, 1956, between the defendant corporation and plaintiff, the contract between defendant corporation and the Railroad was referred to, and it was agreed that plaintiff was to pay the defendant corporation the $5,000 which it had obligated itself to pay the Railroad. By its terms plaintiff and the defendant corporation were to remove the ballast. Plaintiff agreed to give the defendant corporation an indemnification agreement and to provide the other things required in the contract between the Railroad and the defendant corporation.
All money received from the sale of the ballast and ties was to be deposited in the Middletown Branch of the Delaware Trust Company, and drawn only on signatures of plaintiff and the corporate defendant's agent, Knapp, a Vermont lawyer. Under the provisions of Paragraph 12 it was provided:
"It is mutually agreed between the parties, in accordance with memoranda signed by Carmer, that Carmer and the Corporation shall divide the proceeds on a fifty-fifty (50/50) basis after the expense of the $5,000.00 payment insurance storage by the provisions above and that each party will sign the appropriate checks or drafts to allow proper payment of expense and profits from said bank `special account'."
Hicks and Fenwick had their own arrangement with the corporate defendant.
Plaintiff alleges that it was understood that after the first section of the tracks was handled in a manner satisfactory to the Railroad, further operations would continue on succeeding sections. Plaintiff allegedly was to receive one-third of the net profits on other sections, the other two-thirds to be divided between Hicks, Fenwick and the corporate defendant. The *623 defendants deny that plaintiff had any "interest" in the second section, which it later purchased from the Railroad.
The agreement shows that the parties originally contemplated that they would not themselves remove the ballast but would merely enter into a contract with another party to do so. He would be paid in kind. That approach did not materialize. As a result, plaintiff, to defendants' knowledge, had to advance substantial additional sums to pay for the removal of the ballast. For a time Mr. Hicks was in charge of the operation but he took sick and the plaintiff had to take over the supervision. This he did without pay. The removal work on the first section was completed about the end of June 1956.
The plaintiff claims that a joint venture existed not only with respect to the first section which was completed, but also with respect to the second section which was taken over by the corporate defendant without recognizing plaintiff's interest therein. It was agreed that the court would first try the issue of joint venture with respect to both sections but would try the accounting issue only with respect to the first section. This is the decision after final hearing.
Before addressing myself to the meaning and effect of the agreement between plaintiff and the corporate defendant, I should note that plaintiff claims that the individual defendants are also liable as co-joint adventurers or corporate officials with knowledge of or participants in alleged wrongs. The contract was between the corporate defendant and the plaintiff. Thus, formally at least, the individual defendants have no responsibility to plaintiff. Whether the individual defendants are guilty of conduct which would make them personally liable I need not decide because the corporate defendant is clearly able to discharge any liability that may arise with respect to the first section. Consequently, no judgment will be issued against them in connection with the first section. For convenience I shall hereafter only refer to the corporate defendant as the "defendant".
The defendant says that there was no joint venture but a mere contractual relationship with respect to the first section. They do concede that an accounting is nevertheless due from defendant. As I understand defendant's contention it is that since there was no express provision that the defendant was to share losses there could be no joint venture. Assuming that the sharing of losses is a prerequisite to a joint venture, I am satisfied that to the extent necessary the court would here imply a provision to share losses. Indeed, in view of the commitments in the agreement itself, the requirement of the rule would seem to have been met in any event. Compare 30 Am.Jur., Joint Adventure, § 11.
I conclude that the arrangement existing between plaintiff and defendant created a joint adventure. Both parties agree that an accounting is in order with respect to the first section. I now consider the disputed accounting items.
I first consider items of receipts and take them up in the order mentioned in defendant's brief.
Both sides agree that the sum of $48,642.18 was deposited in the corporate bank account. But the corporate defendant's approach to the accounting was to start with what it calls the business income. Thus, he starts with $47,822.18 ($820.00 deducted from bank account total deposits representing "advances" by plaintiff to venture). I shall adopt defendant's approach, although even under this approach there are undisputed non-business income items included.
Starting with the business income of $47,822.18, I next add the $1,430.00 of business income admittedly received by plaintiff but not deposited in the corporate account. There was also admittedly received by defendant and not deposited business income of $5,000. When these figures are added we reach a business income of $54,252.18.
I now consider the disputed business income items which were received by defendant and not deposited in the corporate *624 account or otherwise used for the benefit of the venture.
The first item is the $1,876.70 paid for ballast by Slater and Rogers. Defendant says that only $676.70 is allocable to the first section. Plaintiff says the total amount was for material from the first section.
Based upon my evaluation of the testimony, I conclude that all of this money was for payment of materials taken from the first section. My conclusion is based largely upon my disinclination to accept the testimony of defendant's agent. I say this in part because the date of payment was in 1956 while defendant's agent said that he did not start to remove stone from the second section until June 1957.
In view of my conclusion the $1,876.70 held by defendant must be added to the business income, making it $56,128.88.
I next consider plaintiff's contention that defendant received from Eastburn for payment for materials from the first section the sum of $860.20 and failed to account therefor.
The evidence, without regard to burden, shows that the materials were supplied well before defendant commenced work on the second section. Therefore, the materials must have come from the first section. The fact that Mr. Eastburn could not be entirely certain of the location from which the material came does not change my conclusion. His testimony is consistent with my conclusion.
Thus, $860.20 must be added as business income which gives a grand total of $56,989.08.
I turn next to the business expenses.
Defendant says that checks on the corporate account totaling $25,230.00 were made payable to plaintiff. These checks were to reimburse plaintiff for expenditures made for the benefit of the venture. Defendant says they should not be deemed expenses in computing profit and loss. I do not follow defendant's reasoning. I am satisfied that these payments represented reimbursement to plaintiff for money disbursed by him to cover expenses of the business. Such disbursements generally came from plaintiff's personal checking account. The corporate checks were co-signed by defendant's agent, albeit in advance, and the records were fully available to such agent. I am persuaded that he was fully aware of the purposes for which such payments were being made.
Defendant next attacks the propriety of allowing the last four of the so-called Viscount checks which were drawn on the corporate account.
The Viscount transaction involved plaintiff and defendant in some "deal" which was totally unrelated to the transaction with the Railroad. It is too bizarre to describe except to say that some payments out of the corporate account were made with the approval of plaintiff and defendant's agent. However, defendant's agent denied that the last four payments of $100.00 each were made with his permission. Plaintiff says the Viscount payments were contemplated and were known to defendant through receipt of bank statements, and otherwise. No objection to these payments was made until trial. In view of the use of the corporate account with the consent of defendant's agent to finance this transaction, I think it is too late now to say that this small item should be the subject matter of an independent action.
I conclude that the Viscount payments, which did not benefit plaintiff anymore than they benefitted defendant, should be considered as though they were business expenses.
The defendant also objects to a $300 payment from the corporate account to the Philadelphia National Bank. Defendant says it was unauthorized and unreasonable. I shall not pause to discuss this matter. The record fully supports the propriety of this payment as a business expense.
Defendant has objected to payments to the Thompsons. They worked on the project. *625 This contention could be rejected for lack of particularity but, in any event, there is no basis in the record to attack the propriety of these payments. They were proper business expenses.
I therefore conclude that the business expenses amounted to $54,562.65.
This means that the net business income amounted to $2,426.43. Plaintiff was entitled to 50% thereof.
I now consider the credits and charges between plaintiff and the joint adventure. Plaintiff is charged with $27,360.00 according to defendant. I believe this amount should be reduced by $700.00 (representing proper payments to Viscount and the Philadelphia Bank). I do not believe, as plaintiff contends, that it should be reduced $130.00 more representing reimbursement for advances allegedly made on section two. That matter will arise in the accounting on the second section. Thus plaintiff is charged with $26,660.
I next find that plaintiff is entitled to credits amounting to $30,942.45. To this must be added disbursements for interest on bank loans (except the original $5,000 advanced) which aggregate $374.67. I have eliminated the interest on the original $5,000 advance because I do not believe the agreement contemplated interest thereon. Thus, the grand total is $31,317.12.
This means that plaintiff had a claim against the venture amounting to $5,588.93, on account of advances.
Finally, is plaintiff entitled to interest on any of money personally advanced to the venture? I am satisfied that the original intent to sell the material and pay in kind was changed with the agreement of both parties to the arrangement. This actually resulted in plaintiff financing the operation. Defendant did not use any of its money in the venture.
Giving defendant the benefit of the doubt by concluding that plaintiff's personal advances to the venture were to be interest free, as a sort of contribution to the venture, the fact is that he could have been fully reimbursed had defendant deposited in the corporate account joint venture money which it received up until July of 1956. Since defendant improperly withheld such money it prevented plaintiff from being reimbursed. Under the circumstances of this case plaintiff is entitled to interest on the sums advanced and for which he was not reimbursed ($5,588.93) from August 1, 1956 to the date of judgment hereon. It seems to me that the interest should be at 5% on the assumption that such a return could reasonably have been expected by plaintiff had he been reimbursed and had he invested the money. If the parties desire to be heard in connection with the rate of interest I will be glad to reconsider.
Thus, the balance due plaintiff is $1,213.22 (½ net profits) plus $5,588.93 (credits) or a total of $6,802.15 plus the indicated interest.
Finally I must consider whether defendant should pay interest on the $7,736.90 venture money taken and withheld by it. I find that these sums were improperly withheld. I do not believe plaintiff's action in collecting and applying some $1,430.00 to reimburse himself justified this action by defendant. I conclude that defendant should pay interest on the various sums received from the date they were received by it to the date of judgment.
Once again I believe the rate should be 5% unless counsel desire to be heard. One-half of the amount of this interest can be added to the amount due plaintiff. Thus, the total amount due plaintiff will have been ascertained and it must be paid by defendant because the amount due from defendant to the venture appears to be in excess of the amount due plaintiff.
The next question is whether plaintiff established his right to participate in the work to be done on section two; it appearing that the defendant corporation and some other individuals heretofore mentioned went forward with this work without including plaintiff.
*626 The parties have argued at great length as to whether defendants had a fiduciary duty to plaintiff with respect to the second section. I do not believe it necessary to engage in any elaborate discussion of this matter because the facts established beyond doubt that the second section work was authorized pursuant to an "extra work order" issued by the Railroad to the defendant corporation. This work order provided that the work was to be done "in the same manner and under the same conditions as set forth in the prime contract of which this is a part". Thus, the second section was done pursuant to a work order which in effect merely enlarged the subject matter of the original contract. It will be recalled that plaintiff, through a contract with defendant, was a 50% beneficiary of such contract.
Another vital fact is that Fenwick, on behalf of defendant, obtained a commitment from the Railroad with respect to the second section, without plaintiff's knowledge, even before work was completed on the first section. Moreover, at the time the original contract was executed it was visualized by all parties including plaintiff that the work would be done all the way to Pocomoke City in time if the Railroad was satisfied with the work.
For all of the foregoing reasons, I am satisfied that plaintiff was entitled to an interest in the work to be done on the second section. The defendant's position seems to be that plaintiff apparently waived or disclaimed any interest in proceeding with the second section. I reject defendant's testimony on this score, and conclude that plaintiff did not relinquish his right to a participating interest in the second section.
Although it might perhaps have been argued that plaintiff was entitled to one-half of the net profits from the second section, I have concluded to adopt plaintiff's testimony that he was to be entitled to only one-third of the net profits on the second section.
Defendant will therefore be required to make an appropriate accounting in connection with the second section.
If counsel for plaintiff desires, a final judgment can be entered with respect to the first section under Chancery Court Rule 54 (b), Del.C.Ann.
Present order on notice.